

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1575-12

### JAMES BLACKMAN, Appellant

### v.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIRST COURT OF APPEALS
### HARRIS COUNTY

PRICE, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, WOMACK, JOHNSON, KEASLER, HERVEY, and COCHRAN, JJ., joined. ALCALA, J., did not participate.

### O P I N I O N

A jury convicted the appellant of the felony offense of possession with intent to deliver cocaine in an amount over 400 grams.[1] The trial court assessed his punishment at

---

[1] TEX. HEALTH & SAFETY CODE §§ 481.102(3)(D), 481.112(a).

thirty years' confinement in the penitentiary.[2] The appellant—an African-American himself—argued on appeal that the trial court erred to overrule his objection that the State used a peremptory challenge to strike an African-American prospective juror from service on his petit jury in violation of *Batson v. Kentucky*.[3] The court of appeals agreed,[4] finding that at least one of the prosecutor's purported explanations for the peremptory challenge was a pretext for racial discrimination, and reversed the appellant's conviction on authority of the United States Supreme Court's 2008 opinion in *Snyder v. Louisiana*.[5] We granted the State's petition for discretionary review to examine the propriety of the court of appeals's reliance upon *Snyder* on the particular facts of this case. We now reverse.

## FACTS AND PROCEDURAL POSTURE

### The Peremptory Strike

Of the three African-American prospective jurors who were not successfully challenged for cause, the State peremptorily struck two, including Juror Number 6, Janina Louise Fortune. Early in the voir dire of the sixty-five-member jury panel, Fortune voluntarily responded to the trial court's pedagogical question regarding the State's burden

---

[2] TEX. HEALTH & SAFETY CODE § 481.112(f).

[3] 476 U.S. 79 (1986).

[4] *Blackman v. State*, 394 S.W.3d 264 (Tex. App.—Houston [1st Dist.] 2012).

[5] 552 U.S. 472 (2008).

to prove its case beyond a reasonable doubt—but not beyond all "possible doubt."[6] Fortune affirmed that she would not inappropriately "raise the State's burden of proof." Later, during his portion of the group voir dire, the prosecutor did not speak individually with Fortune. The appellant's counsel, on the other hand, engaged her in the following colloquy:

> [DEFENSE COUNSEL]: Now, what I want to do is just go over there briefly on a number of you have indicated that you have had a prior criminal jury service. And those are the people I want to address just very, very briefly starting on row one.
>
> The first one I have is Juror No. 6, Ms. Fortune?
>
> *VENIREPERSON*: That's correct.
>
> [DEFENSE COUNSEL]: Ma'am, what kind of case did you serve on?
>
> *VENIREPERSON*: It was a case where the person was accused of

---

[6]

> *THE COURT*: . . . Is there another -- did I see another hand on the first row? Your name and number, ma'am, right here?
>
> *VENIREPERSON*: Yes, Juror No. 6.
>
> *THE COURT*: Yes, ma'am, Ms. Fortune, tell me why you think the law does not require the State to prove someone guilty beyond all possible doubt?
>
> *VENIREPERSON*: I think the law doesn't require it because it would be close to impossible.
>
> *THE COURT*: Why is that?
>
> *VENIREPERSON*: You would have to be there. I mean, if you didn't see it, you almost wouldn't be able to prove it to a jury. That's why the law -- if you didn't see it, you wouldn't be able to prove that it happened. So, that's why I think the law doesn't require that it be -- I think the law requires that it be with a reasonable doubt.
>
> *THE COURT*: Okay. Thank you. Thank you, Ms. Fortune.

breaking and entering in a building or something.

[DEFENSE COUNSEL]: Okay, was that a burglary of a habitation?

*VENIREPERSON*: Habitation.

[DEFENSE COUNSEL]: So, burglary of a habitation?

*VENIREPERSON*: Yes.

[DEFENSE COUNSEL]: How long ago was that, ma'am?

*VENIREPERSON*: About three years ago.

[DEFENSE COUNSEL]: Did your jury reach a verdict?

*VENIREPERSON*: We did.

[DEFENSE COUNSEL]: Okay, without telling me what the verdict was, was the jury called in to assess punishment in that case?

*VENIREPERSON*: No.

[DEFENSE COUNSEL]: Okay. Anything about that incident, that jury service that would influence or impact on your ability to be a fair and impartial juror in this case?

*VENIREPERSON*: No.[7]

Defense counsel subsequently engaged in a substantially similar colloquy with all thirteen

of the other prospective jurors who had indicated on their juror questionnaires that they had

---

[7]

The parties seemed to operate under the assumption that the law would absolutely prohibit any inquiry during voir dire into what specific verdict, if any, the prospective jurors had actually reached in the course of their prior jury service. We note that, while it may be within a trial court's discretion to prohibit such a question, in the interest of placing reasonable limitations upon the length of voir dire, there is no *absolute* legal impediment to posing it. *Redd v. State*, 578 S.W.2d 129, 130-31 (Tex. Crim. App. 1979).

previously served on a jury in a criminal case, asking each in turn whether they had "reach[ed] a verdict" and whether they had been "called upon to assess punishment."

After their challenges for cause were ruled upon, the parties submitted their respective peremptory strike lists. The prosecutor struck Fortune and one other African-American, leaving the third African-American to serve on the appellant's jury. Once the names of all the jurors were called out but before the jury was collectively sworn in, defense counsel requested a bench conference, at which he made his *Batson* objection. When the trial court asked the prosecutor to respond, the following dialogue ensued:

> [PROSECUTOR]: . . . As for Juror No. 6, when we started based on the vibe I got from Juror No. 6, in trying to make eye contact, I just didn't feel like I had the same vibe that she had. For example, before we started jury selection when [defense counsel] wanted me to approach the bench, she was paying attention to him the whole time and then actually pointed me out to tell me that he wanted me. That of and in itself isn't that big of a deal but then coupled when she was asked about her prior jury service, I was troubled because she was the only person who used the term that the defendant was accused of -- I think burglary of habitation for stealing something and then we went to the part whether or not she got a verdict or this as punishment she said they didn't. I just got the feeling -- by the way, she said the word accused that she felt like he was wrongfully. I got based on the tone she was the only person who described it as -- everyone else when asked about it, they said it was a theft case or it was this case. So, that was what troubled me with regards to Juror No. 6. As you can see, I placed Juror No. 24 on the panel. There is other people I struck for similar reasons.

> *THE COURT*: For similar reasons, who?

> [PROSECUTOR]: Well, for example, Juror No. 1. In talking to Juror No. 1, I didn't get a good feel for Juror No. 1. He's a white male. While he answered all the questions appropriately, there was responses in the way he answered that I didn't feel like I totally trusted him, so I struck him. Moving

down to Juror No. Which was 11, Juror No. 11, we talked about Juror No. 12 that she indicated she can be fair. She could follow the law. But the way she was talking about things, I did not get a good feel for her. So, I struck her. Juror No. twelve. Going to Juror No. 33, while he didn't say anything, that was reason for cause. Juror No. 33 is a white male. I did not like the vibe I was getting from Juror No. 33. I didn't like the way he had responded to questions, so I struck Juror No. 33. Moving to Juror No. 42, another white male who answered all the questions appropriately, he seemed to be engaging more in what Mr. Nunnery was saying than others were saying, so based on that, I struck Juror No. 42. So, those are the reasons.

THE COURT: [Defense Counsel].

[DEFENSE COUNSEL]: With respect to Juror No. 6 again, I am troubled by the explanation I guess one is a citizen accused until he is convicted. So if -- and I don't have a note here that said she said that it's was an acquittal, notwithstanding that if there was wasn't a conviction [Defense Counsel] a person is presumed to be innocent. So, her saying it is accused, I thinks it's absolutely reaching that is if one of those, Judge, I think twelve I didn't get a feel for that can be quantified or verified in this record.

Again, there is nothing that juror said about prior service that she indicated in any way ever adversely affect their ability to be a fair and impartial juror in this case. Obviously, I can't question going forward any of our other feelings that is very subjective. And personally to you but Judge, that's a pretext. To eliminate jurors who deny my client his right but also her right to serve.

THE COURT: I do recall Juror No. 6 indicating that she had prior jury service. Did she, in fact, say that the jury was not able to reach a verdict?

[PROSECUTOR]: She said they did not assess punishment. She didn't say they weren't able to reach a verdict, but the way she phrased it was they caused me hesitation because said he was accused of breaking into, stealing something, whatever.

THE COURT: [Defense Counsel]'s point, everyone accused.

[PROSECUTOR]: I understand that, but it was the way in which she

said was and then the fact that they did not assess punishment. I listened to it, then it caused me hesitation to think in the tone of voice she said it, the way the eye contact that I was not getting with her, the eye contact he was getting with her, the way she said I felt like she insinuations in my mind that the I was wrongfully accused. I don't know what happened, that's all I have to go from. And so, based on the information I have been given, that's way that was the concern and also coupled it with the fact that prior to if you recall prior to [Defense Counsel] right starting up jury selection, she had looked at -- she was apparently watching him just more which is concern of mine and then when they needed me to approach, I wasn't paying attention. She was looking at me and point to me saying that he wanted me. So, you know, I put those things together; and I just -- that's where I come up with my concerns.

*THE COURT*: Anything else, [Defense Counsel]?

[DEFENSE COUNSEL]: No, Your Honor.

*THE COURT*: The Court deny's the defense's Motion. The Court finds that the State has offered race neutral reasons for exercising their strikes and Venireman No. 6 and No. 11. And the Court will deny the Batson, the defense Batson challenge.[8]

## On Appeal

In sustaining the appellant's *Batson* claim on appeal, the court of appeals set out the facts and governing legal principles and then began its analysis with the following observation:

On appeal, the State identifies the trial prosecutor's stated reasons for striking Fortune as follows: his alleged belief that the jury on which Fortune had previously served had not reached a verdict and her statement that the jury did not assess punishment; Fortune's "tone" and referral to the defendant in the prior case as the "accused"; and her overall bad "vibe," eye contact, and demeanor with the prosecutor in contrast to her attentiveness to [the]

---

[8]

*Sic passim*.

appellant's counsel (including the alleged incident in which she "point[ed]" out to the prosecutor that he was wanted at the bench).[9]

Focusing on the first identified basis for the prosecutor's peremptory strike against Fortune, the court of appeals found no support in the record for the prosecutor's claim that Fortune indicated to defense counsel that the prior jury on which she served had failed to reach a verdict.[10] Moreover, the court of appeals continued, while it is true that Fortune told defense counsel that the jury she had previously served on did not assess punishment, the prosecutor failed to strike two non-African-American prospective jurors who answered the same question identically.[11] From these circumstances, the court of appeals deduced that the first ascribed basis for the State's peremptory strike was clearly pretextual.[12]

The court of appeals next turned to the prosecutor's additional, demeanor-based reasons for the peremptory strike. First, the court of appeals asserted that the trial court, having ruled only generally that "the State has offered race neutral reasons for exercising their strikes," thereby failed to make a specific finding of fact with respect to Fortune's

---

[9] *Blackman*, *supra*, at 268.

[10] *Id*. In fact, Fortune indicated that the previous jury she had served on did reach a verdict, but the appellant's trial counsel seems to have deliberately avoided asking her what that verdict had been.

[11] *Id*.

[12] *Id*.

demeanor.[13] Nor did the court of appeals believe that the record supported the prosecutor's claims that he found Fortune's demeanor to be objectionable. Because the trial court itself had "actually engaged [Fortune] in questioning to illustrate legal concepts to the venire panel[,]" the court of appeals regarded the balance of the record as sufficient to "counter[ ] any suggestion" that Fortune "was inattentive or was sending a bad 'vibe' in the courtroom."[14] Moreover, the court of appeals found, the prosecutor never asked Fortune any questions tending to indicate that his purported concern for her negative attitude was genuine.[15] Finally, the court of appeals opined that "[t]he substance of all of Fortune's answers, including her use of the term 'accused' to describe a criminal defendant in a prior case, is unremarkable."[16] Because the court of appeals believed that the prosecutor had already invoked one basis for Fortune's strike that proved to be pretextual, and the record failed to bear out his other, demeanor-based justifications, it was unwilling to "presume that the trial court relied on the . . . prosecutor's explanation that he struck Fortune as a result of her general demeanor or bad 'Vibe.'"[17] Relying on the Supreme Court's opinion in *Snyder*,

---

[13] *Id*. at 274.

[14] *Id*. at 269. *See* note 6, *ante*.

[15] *Blackman*, *supra*, at 269.

[16] *Id*. at 270.

[17] *Id*.

the court of appeals reversed the appellant's conviction and remanded the case for retrial.[18]

In a spirited dissenting opinion, Justice Keyes complained that the majority had usurped the trial court's prerogative, deriving from the advantage of proximity, to gauge the plausibility of the prosecutor's racially neutral explanations for the exercise of his peremptory strike.[19] After all, she pointed out, *Snyder* itself emphasized the primacy of the trial court's perspective in evaluating the credibility of a prosecutor's explanation, since that task is "peculiarly within a trial judge's province."[20] She rejected as inaccurate the majority's conclusion that the trial court failed to make a specific finding with respect to the prosecutor's demeanor-based explanation.[21] In Justice Keyes's view, the majority, having thus inappropriately removed the trial court entirely from the picture, simply "imagine[d] a plausible reason for the trial court to have ruled other than it did" on the appellant's *Batson* claim.[22] We granted the State's petition for discretionary review to address this vehement

---

[18]

*Id.*

[19]

*Id.* at 271.

[20]

*Id.* at 271-72 (citing *Snyder*, *supra*, at 477, which quotes *Hernandez v. New York*, 500 U.S. 352, 365 (1991), which in turn quotes *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).

[21]

*Blackman*, *supra*, at 274-75.

[22]

*Id.*

disagreement among the justices on the court of appeals.[23]

## THE LAW

### *Batson v. Kentucky*

Under *Batson*,[24] a defendant may be entitled to "a new array" if he can demonstrate, by a preponderance of the evidence, that the prosecutor indulged in purposeful discrimination against a member of a constitutionally protected class in exercising his peremptory challenges during jury selection.[25] As the process has been described by the Supreme Court:

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.[26]

At the second step of this process, the proponent of the strike need only tender an explanation

---

[23] TEX. R. APP. P. 66.3(e).

[24] 476 U.S. 79 (1986).

[25] *Guzman v. State*, 85 S.W.3d 242, 255 & n.48 (Tex. Crim. App. 2002); *Tompkins v. State*, 774 S.W.2d 195, 202 (Tex. Crim. App. 1987); George E. Dix & John M. Schmolesky, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 41:97, at 781 (3d ed. 2011) ("Ultimately, the trial court must decide whether the *Batson* claimant has shown by a preponderance of the evidence that a strike was exercised for an unacceptable reason."). *See also* TEX. CODE CRIM. PROC. art. 35.261(b) ("If the court determines that the attorney representing the state challenged prospective jurors on the basis of race, the court shall call a new array in the case.").

[26] *Purkett v. Elem*, 514 U.S. 765, 767 (1995); *Ford v. State*, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999).

that is racially neutral on its face.[27]  The ultimate plausibility of that explanation is then considered under the third step of the analysis, in which the trial court determines whether the opponent of the strike has satisfied his burden of persuasion to establish by a preponderance of the evidence that the strike was indeed the product of purposeful discrimination.[28]  Whether the opponent satisfies his burden of persuasion to show that the proponent's facially race-neutral explanation for his strike is pretextual, not genuine, is a question of fact for the trial court to resolve in the first instance.[29]

A reviewing court should not overturn the trial court's resolution of the *Batson* issue unless it determines that the trial court's ruling was clearly erroneous.[30]  In assaying the record for clear error, the reviewing court should consider the entire record of voir dire; it need not limit itself to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded

---

[27]

*Purkett*, *supra*, at 767-68.

[28]

*Id*. at 768 ("It is not until the *third* step that the persuasiveness of the justification [for the peremptory strike] becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.").

[29]

*Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004) ("The term 'pretext' is solely a question of fact; there is no issue of law.  Therefore, the trial court was in the best position to make that credibility determination.").

[30]

*Id*.;  *Herron v. State*, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002);  *Whitsey v. State*, 796 S.W.2d 707 (Tex. Crim. App. 1990) (opinion on State's motion for rehearing).

in the appellate record.[31] But a reviewing court should examine a trial court's conclusion that a racially neutral explanation is genuine, not a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous.[32]

### *Snyder v. Louisiana*

In *Snyder*,[33] the Supreme Court applied these general principles to a particular set of facts to conclude that a *Batson* violation occurred. The prosecutor in *Snyder* offered two explanations for his peremptory challenge against an African-American prospective juror, Jeffrey Brooks.[34] First, the prosecutor asserted that Brooks "looked very nervous" under questioning—a demeanor-based challenge that was racially neutral on its face.[35] Second, the prosecutor noted Brooks's worry that jury service might cause him to miss classroom time as a student teacher, thereby threatening his timely graduation. The prosecutor purported to believe that this would cause Brooks to favor any verdict that would avoid a punishment

---

[31]

*Young v. State*, 826 S.W.2d 141, 146 (Tex. Crim. App. 1991); *Vargas v. State*, 838 S.W.2d 552, 556 (Tex. Crim. App. 1992). *Cf. Miller-El v. Dretke*, 545 U.S. 231, 241 n.2 (2005) (in context of federal habeas corpus review under 28 U.S.C. § 2254, federal court could consider entirety of appellate record with respect to voir dire and analyze the treatment of comparable jurors in determining plausibility of prosecutor's race-neutral explanations, though state court was apparently never specifically asked to conduct such an analysis during *Batson* hearing).

[32]

*Gibson*, *supra*, at 534; *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008).

[33]

552 U.S. 472 (2008).

[34]

*Id*. at 478.

[35]

*Id*.

phase of trial in order to expedite his return to the classroom.[36]  With both of these facially race-neutral explanations before him, "[r]ather than making a specific finding on the record concerning Mr. Brooks' demeanor, the trial judge simply allowed the challenge without explanation."[37]

> It is possible that the judge did not have any impression one way or the other concerning Mr. Brooks' demeanor.  Mr. Brooks was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned.  Thus, the trial judge may not have recalled Mr. Brooks' demeanor.  Or, the trial judge may have found it unnecessary to consider Mr. Brooks' demeanor, instead basing his ruling completely on the second proffered justification for the strike.  For these reasons, we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous.[38]

Because the Supreme Court did not regard the prosecutor's demeanor-based explanation to be dispositive, it proceeded to examine the prosecutor's second explanation, *viz*.: that he struck Brooks because of his anxiety about missing classroom time.

The Supreme Court found this second explanation to be plainly pretextual.  In the course of questioning Brooks about his student teaching commitment, the trial judge directed his law clerk to contact Brooks's academic supervisor, who indicated that, so long as

---

[36]

*Id*. at 479.

[37]

*Id*.

[38]

*Id*.

Brooks's jury service lasted no more than a week, it would not cause him any problem.[39]

Upon this representation, Brooks expressed no further reservations about his potential jury

service and the prosecutor asked him no additional questions to explore his attitude about it.[40]

These circumstances, the Supreme Court observed, were enough to render the prosecutor's

race-neutral explanation "suspicious."[41]  Adding the fact that the prosecutor failed to

peremptorily challenge at least two white prospective jurors who expressed even "more

pressing" conflicting obligations than had Brooks,[42] the Supreme Court concluded that the

prosecutor's purported race-neutral explanation "fails even the highly deferential standard

of review that is applicable" in the appellate review of *Batson* claims.[43]

"The prosecutor's proffer of this pretextual explanation[,]" the Supreme Court next

observed, "naturally gives rise to an inference of discriminatory intent."[44]  The Supreme

Court noted that in similar contexts it had held that, "once it is shown that a discriminatory

intent was a substantial or motivating factor in an action taken by a state actor, the burden

---

[39] *Id*. at 480-81.

[40] *Id*. at 481.

[41] *Id*. at 483.

[42] *Id*. at 483-84.

[43] *Id*. at 479.

[44] *Id*. at 485.

shifts to the party defending the action to show that this factor was not determinative."[45] The Supreme Court found it unnecessary to decide under the particular facts presented in *Snyder* whether a strict but-for standard of causality should apply,[46] under which the State would have to show that it would have struck Brooks on account of his demeanor alone:

> For present purposes, it is enough to recognize that a peremptory strike shown to have been motivated in substantial part by discriminatory intent could not be sustained based on any lesser showing by the prosecution. And in light of the circumstances here—including absence of anything in the record showing that the trial judge credited the claim that Mr. Brooks was nervous, the prosecution's description of both of its proffered explanations as "main concern[s]," . . . and the adverse inference [of discriminatory intent] noted above—the record does not show that the prosecution would have pre-emptively challenged Mr. Brooks based on his nervousness alone.[47]

Accordingly, the Supreme Court concluded that the State had failed to satisfy its burden to establish from the record that the prosecutor's peremptory strike was *not* based improperly upon Brooks's race and reversed the lower court's judgment.[48]

---

[45]   *Id*. (citing *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)).

[46]   In *Hunter*, *supra*, the Supreme Court had characterized the standard it endorsed as a "but-for" standard: "Once racial discrimination is shown to have been a substantial or motivating factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Id*. at 228 (internal quotation marks and citations omitted). Moreover, "an additional purpose to discriminate . . . would not render nugatory the purpose to discriminate against all blacks, and it is beyond peradventure that the latter was a 'but-for' motivation for" the state action. *Id*. at 232.

[47]   *Snyder*, *supra*, at 485.

[48]   *Id*. at 486.

In a later opinion, the Supreme Court rejected the notion that *Snyder* should be read to support a categorical rule "that a demeanor-based explanation for a peremptory challenge must be rejected [by a reviewing court] unless the [trial] judge personally observed and recalls the relevant aspect of the prospective juror's demeanor."[49] While conceding that a trial judge's observations are obviously "of great importance[,]" the Supreme Court held that the judge may nevertheless accept a prosecutor's proffered demeanor-based race-neutral explanation even "in the absence of [the judge's own] personal recollection of the juror's demeanor[.]"[50] Moreover, since *Snyder*, this Court has reiterated that a prospective juror's demeanor may be "considered proved on the record" if the prosecutor recites his observation of that demeanor for the record and defense counsel fails to "rebut the observation."[51]

## ANALYSIS

Simply put, the court of appeals erred to conclude that *Snyder* governs the facts of this case. In our view, the court of appeals's analysis went wrong in three respects. First, it misinterpreted the prosecutor's proffer of racially neutral explanations for striking Fortune to include two non-demeanor-based reasons, namely: that the jury on which she had

---

[49] *Thaler v. Haynes*, 559 U.S. 43, 47 (2010).

[50] *Id*. at 49.

[51] *See Nieto v. State*, 365 S.W.3d 673, 680 (Tex. Crim. App. 2012) ("We have held that the demeanor of a potential juror is a valid reason to exercise a peremptory strike.") (citing *Yarborough v. State*, 947 S.W.2d 892 (Tex. Crim. App. 1997)).

previously served had neither 1) reached a verdict, nor 2) assessed punishment.[52] Because the prosecutor never offered either of these as explanations for his peremptory strike in the first place, they can hardly be deemed a cover-up for a discriminatory intent. Second—and as a consequence of its first mistake—the court of appeals erred to conclude that the trial court made no ruling with respect to the prosecutor's demeanor-based explanations for his peremptory challenge.[53] Finally, in the absence of an inference of discriminatory intent arising from a pretextual explanation, the court of appeals erred in shifting the burden of proof to the State, a la *Snyder*, to rebut an inference that these purported explanations conclusively established discrimination.

## The Prosecutor's Explanations

According to the court of appeals, "the State identifie[d]" (presumably in its brief on direct appeal, although the court of appeals did not say) the prosecutor's stated reasons for striking Fortune as including, first and foremost, "his alleged belief that the jury on which Fortune had previously served had not reached a verdict and her statement that the jury did not assess punishment."[54] But, the court of appeals observed, Fortune never actually *said* that

---

[52] *Blackman*, *supra*, at 268.

[53] *Id*. at 269.

[54] *Id*. at 268.

the previous jury on which she served did not reach a verdict—in fact, she said, "We did."[55]

Moreover, the panel contained other, non-minority prospective jurors who had served on previous juries that were not called upon to assess punishment, and the prosecutor did not peremptorily challenge any of *them* on that basis.[56]  For these reasons, the court of appeals declared these two explanations to be pretextual, and therefore sufficient to shift the burden of proof to the State to rebut the "inference of discriminatory intent."[57]

We find nothing in the State's brief on direct appeal, however, that serves to identify these particular explanations as among the prosecutor's proffered reasons for exercising a peremptory challenge against Fortune.[58]  The only relevant passage from the State's brief on direct appeal reads:

> The prosecutor explained that he struck Fortune because he did not have the same "vibe" that she did when attempting to make eye contact.  He also indicated that he was troubled by the manner in which Fortune addressed a defendant in her prior jury service as "the accused."  Her tone indicated to him that the defendant had been wrongfully accused.  Additionally, the prosecutor felt that appellant's trial counsel was obtaining eye contact from

---

[55]
*Id.*

[56]
*Id.*

[57]
*Id.* (citing *Snyder*, *supra*, at 485).

[58]
We do not mean to suggest that the State's brief would control this issue of fact—it is, of course, the record that controls. We only mention the State's brief to illustrate that the court of appeals was mistaken to assert that the State acknowledged on direct appeal that Fortune's answers to defense counsel's questions with respect to her prior jury service formed one of the bases for its peremptory challenge against her. We find no such acknowledgment in the State's appellate brief.

Fortune in a manner that he was not.[59]

Nor do we believe that the record can support the court of appeals's view. The prosecutor's protracted explanations for striking Fortune did not include *either* the fact that he believed (even if mistakenly) that the jury on which she had previously served had not reached a verdict *or* that it had not been called upon to assess punishment. As we read the record,[60] the prosecutor mentioned these facts only by way of background, to describe the context in which he had observed Fortune's demeanor during voir dire. That is, we believe that the prosecutor was simply identifying the circumstances in which Fortune had spoken the word "accused," explaining that the "manner" in which she said it aroused his suspicion that she might prove, if selected to serve on the appellant's jury, too much of a defense-prone juror for the State's comfort. Consequently, the court of appeals erred to conclude that the specifics of Fortune's prior jury service constituted independently proffered explanations for the prosecutor's peremptory strike *at all*, much less that they constituted plainly *pretextual* explanations.

---

[59] State's Appellate Brief at 14 (citations to the reporter's record omitted).

[60] As we have already quoted in the text, *ante*, the prosecutor explained:

I was troubled because she was the only person who used the term that the defendant was accused of -- I think burglary of habitation for stealing something and then we went to the part whether or not she got a verdict or this as punishment she said they didn't. I just got the feeling - - by the way, she said the word accused that she felt like he was wrongfully.

### The Trial Court's Finding and the Burden of Persuasion

Two consequences flow from the court of appeals's mistake in this regard, and both serve to distinguish this case from *Snyder*. First, the court of appeals erred to conclude that the trial court simply "allowed the challenge without explanation."[61] Because the *only* explanations the prosecutor offered for his peremptory challenge against Fortune were based on his perceptions of her demeanor, the trial court's ultimate ruling ("The Court finds that the State offered race neutral reasons for exercising their strikes") could only have constituted a determination with respect to the genuineness of the prosecutor's demeanor-based explanations. Thus, unlike in *Snyder*, here the record contains a particular finding from the trial court with respect to the veracity of the prosecutor's demeanor-based explanation that a reviewing court must ordinarily defer to under the clearly erroneous standard of appellate review.

Second, and more importantly, because the court of appeals erred to identify a *pretextual* explanation for the State's peremptory challenge against Fortune, it also erred when it shifted the burden of persuasion to the State, as the Supreme Court did in *Snyder*, to "show that this [pretextual] factor was not determinative."[62] On the facts of this case, the ultimate burden of persuasion remained with the appellant as the opponent of the peremptory

---

[61]
*Blackman*, *supra*, at 269 (citing *Snyder*, *supra*, at 479).

[62]
*Snyder*, *supra*, at 485.

challenge,[63] and the court of appeals should simply have evaluated the record, much as Justice Keyes did, to determine whether the trial court's finding—that the prosecutor's racially neutral, demeanor-based explanations were genuine—was clearly erroneous.

## Was the Trial Court's Ruling Clearly Erroneous?

When we undertake that evaluation, we conclude that the trial court's finding was not clearly erroneous. A prospective juror's demeanor may give rise to a legitimate, racially neutral peremptory challenge.[64] Here, the prosecutor explained that, from the way in which Fortune intoned the word "accused" in her answers to defense counsel's queries about her prior jury service, he believed that she could prove to be unduly sympathetic to criminal defendants. This impression was amplified by his perception that Fortune's eye contact with respective counsel suggested a stronger rapport with the defense than with the State. On the face of it, these explanations do not turn on Fortune's race. It is true that the prosecutor's impression may have been artificially reinforced by his mistaken assumption, based on Fortune's assertion that the jury upon which she had previously served did not assess punishment, that it had also been unable to reach a verdict. Indeed, in retrospectively explaining his challenge against Fortune, the prosecutor frankly *acknowledged* that this was a mistake. But as long as his mistake was an honest one, it does not impugn the racially

---

[63] *Purkett*, *supra*, at 768.

[64] *Nieto*, *supra*, at 680; *Yarborough*, *supra*, at 895.

neutral character of his explanation.[65]

Defense counsel never challenged the sincerity of the prosecutor's assessment of Fortune's demeanor.  Instead, he urged the propriety of characterizing a criminal defendant who has not yet been convicted as nothing more than an "accused," and argued that Fortune's use of the term did not "adversely affect [her] ability to be a fair and impartial juror in this case."  But "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause."[66]  The prosecutor's avowed concern had nothing to do with the propriety of Fortune's use of the term, but with what he thought her choice of terminology—and in particular, her manner in voicing it—conveyed about her attitude toward his role in the criminal-justice system.  He did not have to be accurate in his assessment of Fortune's attitude so long as his perception was sincere,[67] and the question of his sincerity was a fact issue for the trial court, meriting deference on appeal.[68]

In a similar vein, the court of appeals viewed the trial court's pedagogical colloquy with Fortune early during the group voir dire as sufficient to belie any inference "that Fortune

---

[65]

   *Cf. Ford*, *supra*, at 694 ("All appellant has proven on appeal is that the reason [that the prosecutor gave for exercising a particular peremptory challenge] was incorrect; this is not equal to proving that the reason given was a pretext for a racially motivated strike.").

[66]

   *Batson*, *supra*, at 97.

[67]

   *Ford*, *supra*, at 694.

[68]

   *Gibson*, *supra*, at 534.

was inattentive or was sending a bad 'vibe' in the courtroom."[69]  But the prosecutor never claimed that Fortune was inattentive; he claimed that she was more attentive to defense counsel than to him.  Likewise, his complaint was not that Fortune's "vibe" was *generally* "bad," as the court of appeals seems to have thought,[70] but that he perceived her "vibe" to be overly defense oriented.  Moreover, when prompted by the trial court, the prosecutor identified several non-African-American prospective jurors whom he had likewise peremptorily struck on account of their apparent "vibe" or rapport with defense counsel.  The appellant offered nothing on the record to discredit the sincerity of these prosecutorial perceptions, and the trial court was entitled to credit the prosecutor's assertion that he struck similarly positioned non-African-Americans as an indication that his strike against Fortune was not racially motivated.[71]  We hold that the trial court did not clearly err to find that the prosecutor's explanations were genuine and to conclude, accordingly, that the appellant

---

[69]

   *Blackman*, *supra*, at 269.  *See* note 6, *ante*.

[70]

   *Blackman*, *supra*, at 269.

[71]

   *See* George E. Dix & John M. Schmolesky, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 41:113, at 804 (3d ed. 2011) ("Of course, comparative analysis is a two-edged sword. It can be used by the striking party to demonstrate purity of motive by showing that panelists of all groups with certain characteristics were struck with the same or similar frequency."); *Watkins*, *supra*, at 453 (peremptory challenge against African-American prospective juror who was reluctant to assess a life sentence was not shown to be racially motivated when the prosecutor also struck two non-African-Americans for the same reason); *Mayfield v. State*, 906 S.W.2d 46, 53 (Tex. App.—Tyler 1995, pet. ref'd) (peremptory challenges against two African-Americans on the basis that they had family members with criminal backgrounds were found not to be pretextual in light of the fact that several other, non-African-American prospective jurors were struck for the same reason).

failed to meet his burden to establish by a preponderance of the evidence that the State indulged in purposeful discrimination by striking Fortune from the petit jury on the basis of her race.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the court of appeals. Because both of the appellant's other two points of error on appeal have been determined adversely to him,[72] we affirm the judgment of the trial court.

DELIVERED:        December 11, 2013
PUBLISH

---

[72] The appellant raised three points of error on appeal, including his *Batson* claim. On original submission, the court of appeals held the evidence to be legally insufficient to support the appellant's verdict of guilty of possession of cocaine with intent to deliver. *Blackman v. State*, 349 S.W.3d 10, 24 (Tex. App.—Houston [1st Dist.] 2009). Because this resulted in a remand for entry of a judgment of acquittal, the court of appeals did not address the appellant's remaining points of error, which also included a factual-sufficiency claim. This Court reversed the judgment of the court of appeals on the legal-sufficiency issue and remanded for consideration of the appellant's remaining points of error on appeal. *Blackman v. State*, 350 S.W.3d 588, 596 (Tex. Crim. App. 2011). On remand, the court of appeals recognized that the appellant's factual-sufficiency claim was foreclosed by this Court's intervening opinion in *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010). *See Blackman*, *supra*, 394 S.W.3d at 265 (because "we now review . . . the factual sufficiency of the evidence under the same appellate standard of review as that for legal sufficiency[,] . . . the only remaining point is appellant's *Batson* challenge").