**Opinion issued October 11, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-08-00138-CR

_____

**JAMES BLACKMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 230th District Court**
**Harris County, Texas**
**Trial Court Case No. 1121171**

---

## O P I N I O N

A jury found appellant, James Blackman, guilty of the offense of possession

with the intent to deliver a controlled substance, namely cocaine,[1] and assessed his

---

[1]     *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.002(5), 481.102(3)(D),
        481.112(a), (f) (Vernon 2010).

punishment at confinement for thirty years. In three points of error, appellant contends that the evidence is legally and factually insufficient to support his conviction and the trial court erred in denying his *Batson*[2] challenge.

We previously held that the evidence is legally insufficient to support appellant's conviction for the offense of possession of a controlled substance with intent to deliver. *Blackman v. State*, 349 S.W.3d 10, 24 (Tex. App.—Houston [1st Dist.] 2009), *rev'd*, 350 S.W.3d 588 (Tex. Crim. App. 2011). Having so held, we did not address appellant's second and third points of error. *Id.* The Texas Court of Criminal Appeals, concluding that legally-sufficient evidence supports appellant's conviction, reversed our judgment and remanded the case to us to address appellant's remaining points. *Blackman v. State*, 350 S.W.3d 588, 596 (Tex. Crim. App. 2011). Additionally, we now review, in criminal cases, the factual sufficiency of the evidence under the same appellate standard of review as that for legal sufficiency. *Ervin v. State*, 331 S.W.3d 49, 52–55 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 894–913 (Tex. Crim. App. 2010)). Accordingly, the only remaining point is appellant's *Batson* challenge.

We reverse and remand.

---

[2] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986).

## Background

During its voir dire, the State asked a series of questions of certain venire members who had indicated that they had previously served on a jury in a criminal case, including venire member number 6, Ms. J. Fortune. The State asked Fortune about the type of criminal case that she had served on, and she answered, "It was a case where the person was accused of breaking and entering in a building or something." In response to further questioning, she stated that the case involved a burglary of a habitation and she had served on the jury "about three years ago." When asked whether the jury had been "called in to assess punishment in the case," Fortune replied, "No." The State did not ask whether the jury had reached a verdict. When asked whether her prior jury service "would influence or impact [her] ability to be a fair and impartial juror in this case," Fortune replied, "No." The State did not direct any further questions to Fortune. During appellant's voir dire, Fortune agreed, along with other jurors who were questioned about the matter, that it was possible for a police officer to be untruthful on the witness stand. Appellant's counsel did not direct any further questioning to Fortune.

The State exercised one of its peremptory challenges to strike Fortune from the jury. Appellant objected and raised a *Batson* challenge to the State's strike. During the trial court's *Batson* hearing, which was conducted at the bench, appellant's counsel explained that Fortune is African American and, in the "initial

panel[,] except for those blacks that were challenged for cause . . . there were only three blacks in the available group." He explained that the State used two of its strikes to "eliminate" two of the three remaining African Americans from the jury. Appellant argued that there is "nothing in the record to indicate" that Fortune had expressed any bias and the fact that one of the remaining African-American venire members was seated on the jury did not excuse the State's conduct.

In response, the trial prosecutor explained that he struck Fortune based upon a "vibe" that he got from her in "trying to make eye contact." He asserted that, before jury selection, Fortune had been "paying attention" to appellant's counsel "the whole time" and had "actually pointed" to the prosecutor "to tell" him that appellant's counsel wanted to "approach the bench." The prosecutor also asserted that he became "troubled" by Fortune's responses to questions about her prior jury service. He explained that Fortune "was the only person who used the term that the defendant was *accused* of—I think burglary of a habitation for stealing something and then we went to the part whether or not she got a verdict or this as punishment she said they didn't." (Emphasis added.) The prosecutor further explained:

> I just got the feeling—by the way, she said the word accused that she felt like he was wrongfully. I got based on the tone she was the only person who described it as—everyone else when asked about it, they said it was a theft case or it was this case. So, that was what troubled me with regard to [Fortune]. As you can see, I placed Juror No. 24

4

[another African-American panel member] on the panel. There [are] other people I struck for similar reasons.

The trial court then asked the prosecutor who he had struck for similar reasons, and the prosecutor identified (1) a white male that he had struck because of a bad "feel[ing]" and a lack of trust, (2) a female that he had struck because of a bad "feel[ing]," (3) a white male that he had struck for a bad "vibe" and for responses to questions that the prosecutor "disliked," and (4) a white male that he had struck because he "seemed to be engaging more" with appellant's counsel during voir dire.

Appellant's counsel remarked that he was "troubled" by the prosecutor's explanation for striking Fortune because a defendant actually stands "accused" of a criminal offense and is presumed innocent until proven guilty. Appellant's counsel also noted that the record did not indicate that the jury on which Fortune had previously served acquitted the defendant and, thus, the prosecutor's reasons for striking Fortune constituted a pretext.

In response to the trial court's further questioning of him, the prosecutor clarified his prior explanation, noting that Fortune had stated that she had not assessed punishment during her prior jury service. The prosecutor agreed that Fortune had not stated that the jury on which she had served had been unable "to reach a verdict." He maintained, however, that the way in which Fortune had "phrased" her answer about her prior jury service caused him "hesitation" because

5

she referred to the defendant in the prior case as the "accused." When further asked by the trial court about Fortune's reference to the defendant in the prior case as an "accused," the prosecutor explained,

> I understand that, but it was the way in which she said it was and then the fact that they did not assess punishment. I listened to it, then it caused me hesitation to think in the tone of voice she said it, the way the eye contact that I was not getting with her, the eye contact [appellant's counsel] was getting with her, the way she said I felt like she insinuations in my mind was that the I was [sic] wrongfully accused. I don't know what happened, that's all I have to go from. And so, based on the information I have been given, that's why that was the concern and also coupled with it with fact [sic] that prior to if you recall prior to [appellant' counsel] starting up jury selection, she had looked at —she was apparently watching him just more which is concern of mine and then when they needed me to approach, I wasn't paying attention. She was looking at me and point to me saying that [appellant's counsel] wanted me. So, you know, I put those things together, and I just—that's where I come up with my concerns.

The trial court then denied appellant's *Batson* challenge without explanation.

### *Batson* Challenge

In his third point of error, appellant argues that the trial court erred in overruling his *Batson* challenge to the State's use of a peremptory strike against Ms. Fortune[3] because the State's reasons for striking her constituted a "pretext for racial bias." He asserts that the State may not rely upon a bad "vibe" or a venire member's reference to the "accused" in a criminal case as race-neutral reasons for striking an African American from the venire.

---

[3] At trial, appellant also raised a *Batson* challenge in regard to venire member number eleven, but appellant has dropped this challenge on appeal.

The use of a peremptory challenge to strike a potential juror because of race violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986). It also violates Article 35.261 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 35.261 (Vernon Supp. 2012). In *Batson*, the United States Supreme Court provided a three-step process for trial courts to use in adjudicating a claim that a peremptory challenge is based on racial discrimination. 476 U.S. at 96–98, 106 S. Ct. at 1723–24; *see also Snyder v. Louisiana*, 552 U.S. 472, 476–78, 128 S. Ct. 1203, 1207–08 (2008); *Miller-El v. Cockrell*, 537 U.S. 322, 328–29, 123 S. Ct. 1029, 1035 (2003); *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). First, a defendant must make a prima facie showing that the peremptory challenge has been exercised on the basis of racial discrimination. *Cockrell*, 537 U.S. at 328–29, 123 S. Ct. at 1035. Second, if the prima facie showing has been made, the State must offer a race-neutral explanation for the strike. *Id.* Third, the trial court must decide whether the defendant has shown purposeful racial discrimination. *Id.*; *Grant v. State*, 325 S.W.3d 655, 657 (Tex. Crim. App. 2010).

On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. *Snyder*, 552 U.S. at 477–78, 128 S. Ct. at 1207. The "critical question" in determining whether the opponent of a strike has

7

proved "purposeful discrimination" is "the persuasiveness of the prosecutor's justification for his peremptory strike." *Cockrell*, 537 U.S. at 338–39, 123 S. Ct. at 1040. The State must "stand or fall on the plausibility of [its] reasons" for striking a juror. *Miller–El v. Dretke*, 545 U.S. 231, 252, 125 S. Ct. 2317, 2332 (2005). The State's proffer of a "pretextual explanation naturally gives rise to an inference of discriminatory intent." *Snyder*, 552 U.S. at 485, 128 S. Ct. at 1212. "[W]hen the State's explanation for striking a juror is clearly contrary to the evidence, . . . there is no innocent mistake," and the case must be "reversed for *Batson* error." *Greer v. State*, 310 S.W.3d 11, 16 (Tex. App.—Dallas 2009, no pet.).

On appeal, the State identifies the trial prosecutor's stated reasons for striking Fortune as follows: his alleged belief that the jury on which Fortune had previously served had not reached a verdict and her statement that the jury did not assess punishment; Fortune's "tone" and referral to the defendant in the prior case as the "accused"; and her overall bad "vibe," eye contact, and demeanor with the prosecutor in contrast to her attentiveness to appellant's counsel (including the alleged incident in which she "point[ed]" out to the prosecutor that he was wanted at the bench).

There is no factual basis in the record to support the State's argument that the jury on which Fortune had previously served did not reach a verdict. As the trial prosecutor agreed in subsequent clarifying remarks during the *Batson* hearing,

8

Fortune only stated, in response to a direct question from the prosecutor, that the jury did not assess punishment. The prosecutor asked essentially identical questions of venire members seven and eight regarding whether they had assessed punishment during their prior jury service. As did Fortune, both of these venire members, who were not African American, similarly stated that they had not assessed punishment during their prior jury service. Despite their nearly identical answers to the prosecutor's question, venire members seven and eight were seated on the jury. The State offers no explanation as to why its purported race-neutral reason for striking Fortune, based upon the fact that she did not assess punishment during her prior jury service, did not apply to striking these other venire members. We conclude that the State's purported race-neutral explanation, which changed during the *Batson* hearing and ultimately is not supported by the record, for striking Fortune based upon her prior jury service, was not genuine and was pretextual. Thus, it "naturally gives rise to an inference of discriminatory intent." *See Snyder*, 552 U.S. at 485, 128 S. Ct. at 1212.

The other reasons provided by the State for striking Fortune generally relate to her purported bad "vibe," i.e., the tone of her voice, lack of eye contact with the trial prosecutor, and her contrasting attentiveness to appellant's counsel. The United States Supreme Court has addressed a *Batson* challenge based, in part, on similar concerns expressed about a venire member's demeanor during voir dire.

9

*See Snyder*, 552 U.S. at 477–78, 128 S. Ct. at 1208. In *Snyder*, the Court considered two purported race-neutral reasons offered by a prosecutor to explain the peremptory challenge of an African-American venire member. *Id*. The prosecutor explained that he had struck the African-American venire member because he appeared "nervous" and had conflicting obligations as a student-teacher. *Id*. In regard to the first stated reason of "nervousness," the Court acknowledged the "pivotal role" of trial courts in evaluating *Batson* challenges, noting that a trial court "must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id*. The Court explained that an appellate court must therefore defer to a trial court's determinations of credibility and demeanor "in the absence of exceptional circumstances." *Id*. It emphasized that deference to the trial court "is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike." *Id*. at 479, 128 S. Ct. at 1209. However, the Court noted that the record in the case before it did not reflect that the trial court had "actually made a determination concerning" the challenged venire member's demeanor but instead had "allowed the challenge without explanation." *Id*. Because the trial court could have relied upon the second proffered reason for the strike, which did not concern the challenged venire

10

member's demeanor, the Supreme Court could not "presume" that the trial court had credited the demeanor explanation. *Id*.

The Supreme Court then considered the second reason for the strike, i.e., the venire member's conflicting obligations. The Court held that the record refuted the prosecutor's conflicting-obligations explanation, and it noted that the "suspicious" nature and "implausibility" of this explanation was "reinforced" by the fact that the prosecutor did not strike white venire members who had disclosed conflicting obligations similar to those expressed by the struck venire member. *Id*. at 482–83, 128 S. Ct. at 1210–11. The Court held that, in light of the circumstances and the absence of anything in the record to show that the trial court had credited the prosecutor's demeanor explanation, the trial court had clearly erred in denying the defendant's *Batson* challenge. *Id.* at 485–86, 128 S. Ct. at 1212.

Here, the trial court did not make a finding that the State had credibly relied on Fortune's demeanor or her bad "vibe" in exercising the peremptory challenge against her. In fact, the record reveals that the trial court, based upon Fortune's prior jury service, actually engaged her in questioning to illustrate legal concepts to the venire panel.[4] This counters any suggestion that the trial court would have

---

[4] During its remarks to the jury preceding voir dire, the trial court asked the venire panel why the law does not require the State to prove something beyond "all possible doubt." Fortune answered that such a burden would be "close to impossible" and so the law requires "a reasonable doubt." The trial court subsequently posed additional questioning to Fortune based upon the fact that she

11

credited the State's explanation that Fortune was inattentive or was sending a bad "vibe" in the courtroom. And there is nothing in the record to indicate that Fortune favored appellant or appellant's counsel. *See Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 518 (Tex. 2008) (stating that "[p]eremptory strikes may legitimately be based on nonverbal conduct, but permitting strikes based on an assertion that nefarious conduct 'happened,' without identifying its nature and without any additional record support, would strip *Batson* of meaning").[5]

---

had previously served on a jury. In response to the trial court's questioning, Fortune again agreed that the State must present evidence demonstrating guilt beyond a reasonable doubt.

[5] The Texas Court of Criminal Appeals has recently stated its position that the exercise of a peremptory challenge by the State based upon a venire member's purported demeanor is "considered proved" if defense counsel does not "rebut the observation" of the State. *See Nieto v. State*, 365 S.W.3d 673, 680 (Tex. Crim. App. 2012). In addressing demeanor-based challenges in its *Nieto* opinion, the court of criminal appeals did not substantively discuss the United States Supreme Court's opinion in *Snyder*, which we find to be more similar to the instant case. *Nieto* is distinguishable from both *Snyder* and the instant case because, in *Nieto*, the court concluded that the State's non-demeanor based explanation passed muster and did not constitute a pretext. *Id*. at 679. Specifically, in *Nieto*, prior to addressing the State's demeanor-based challenges, the court of criminal appeals concluded that the State's use of a peremptory challenge to strike a venire member because he shared the same last name as the defendant was "sensible" and race-neutral. *Id*.

In contrast, here, similar to the facts in *Snyder*, the alternative, non-demeanor based explanation put forth by the State for striking Fortune was pretextual. Additionally, we note that although appellant's trial counsel did not directly rebut the trial prosecutor's assertion that Fortune gave him a bad "vibe," appellant's trial counsel emphasized that there was "nothing" in the record indicating that Fortune's prior jury service had adversely affected her ability to be an impartial juror, and he noted that the prosecutor's "other feelings" were "very subjective." The record also reflects that during the questioning of Fortune, the prosecutor did

The trial prosecutor did not ask any questions of Fortune indicating that he was concerned with her general "vibe," demeanor, or attentiveness. *See id.* (stating that "[n]onverbal conduct or demeanor, often elusive and always subject to interpretation, may well mask a race-based strike"; "verification" of non-verbal conduct giving rise to use of peremptory strike "may come from the bench if the court observed it," "may be proved by the juror's acknowledgement," or may be borne out by "detailed explanations of counsel"; and complained-of conduct must "be proved and reflected in an appellate record" and identified "with some specificity"). The substance of all of Fortune's answers, including her use of the term "accused" to describe a criminal defendant in a prior case, is unremarkable. Fortune's answers to the other questions concerning her prior jury service are consistent with those offered by other non-African-American venire members who the State did not strike from the jury.

---

not make any reference to any purported negative tone or "vibe." Nor did the prosecutor express any concern when Fortune referred to the defendant in the prior case in which she had served on a jury as the "accused." Finally, as discussed herein, the record reveals that on at least two occasions during voir dire the trial court engaged in a series of questions with Fortune to illustrate legal concepts to the venire and, afterwards, the trial court thanked Fortune for participating in these discussions. There is nothing in the record before us to substantiate a claim that Fortune was not being attentive to all parties in the proceeding or was sending a bad "vibe" in the courtroom.

We must conclude that the State offered a pretextual reason for striking Fortune, giving rise to an adverse inference of racial discrimination. And, as in *Snyder*,[6] we cannot presume that the trial court relied on the trial prosecutor's explanation that he struck Fortune as a result of her general demeanor or bad "vibe." *See Snyder*, 552 U.S. at 479–86, 128 S. Ct. 1209–12. Accordingly, we hold that the trial court clearly erred in denying appellant's *Batson* challenge to the State's use of a peremptory strike against Fortune.

---

[6] The Supreme Court has since further explained its holding in *Snyder*. In *Thaler v. Haynes*, the Court stated that, in *Snyder,* it "concluded that the record refuted the explanation that was not based on demeanor and, in light of the particular circumstances of the case," the prosecutor's exercise of the peremptory challenge "could not be sustained on the demeanor-based ground, which might not have figured in the trial judge's unexplained ruling." 130 S. Ct. 1171, 1174–75 (2010). The Court cautioned that it had not created in *Snyder* a blanket rule that a "demeanor-based explanation must be rejected if the [trial court] did not observe or cannot recall the juror's demeanor." *Id*. at 1174. Our holding is consistent with *Snyder*, as further explained by *Thaler*, because, in this case, the State provided both a demeanor-based explanation, which is not substantiated in the record, and a second explanation that we have concluded is pretextual. Because the second explanation is pretextual, we cannot presume that the trial court relied on the State's demeanor-based explanation. *See id.* at 1174–75.

14

## Conclusion

We reverse the judgment of the trial court and remand for proceedings consistent with this opinion.


Terry Jennings
Justice

Panel consists of Justices Jennings, Keyes, and Higley.

Justice Keyes, dissenting.

Publish.   TEX. R. APP. P. 47.2(b).

15